UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/20/09
```

-------------------------------------------------------------x

NEWTON RODRIGUEZ,

                  Plaintiff,

     - against -                           07 cv 07349 (CM)

MODERN HANDLING EQUIPMENT OF NJ, INC.,
MODERN HANDLING EQUIPMENT OF NEW
YORK, INC., MODERN GROUP LTD., MODERN,
STARLIFT EQUIPMENT CO., INC.

                  Defendants.

-------------------------------------------------------------x

## MEMORANDUM AND ORDER DENYING DEFENDANT STARLIFT EQUIPMENT COMPANY, INC.'S MOTION FOR SUMMARY JUDGMENT

McMahon, J.:

      On June 7, 2005, plaintiff Newton Rodriguez ("Rodriguez") was injured while

operating a forklift. (Compl. ¶ 79.) At the time of the accident, Rodriguez was employed

by American Specialties, Inc. ("American Specialties") and was performing work at its

place of business in Yonkers, New York. (Id. ¶ 72; Def. Rule 56.1 Stmt. ¶ 1.) Plaintiff

contends that, although he engaged the forklift's parking brake, when he got off the

machine to fetch a tool, the forklift inexplicably began to move and struck him.

(Rodriguez Dep. Tr. at 51:19-52:1.[1])

---

[1] After it was discovered that citations to portions of the Rodriguez Deposition Transcript
were not provided in the record, the defendant provided the Court with the complete
Rodriguez Deposition Transcript.

On or about March 12, 2007, Plaintiff sued the above-captioned defendants for his injuries, alleging that each one manufactured, sold, and made repairs to the forklift involved in his accident.

On September 2, 2008, plaintiff and defendants Modern Handling Equipment of N.J., Inc., Modern Equipment Of New York, Inc. and Modern Group, Ltd. entered into a stipulation of discontinuance with prejudice (the "Stipulation"). (Dkt. # 9.) The stipulation covered all cross-claims, counter claims and third-party actions asserted on behalf of plaintiff or co-defendants. [2] (Id.)

On September 25, 2008, Starlift Equipment Company, Inc. ("Starlift"), the only remaining defendant, moved for summary judgment pursuant to Federal Rule of Civil Procedure 56 dismissing plaintiff's claims against Starlift.

Because the record reveals material issues of fact concerning which forklift plaintiff was operating on the day of his accident, Defendant's motion is denied.

### *Background*

Plaintiff's Relevant Employment History at American Specialties

Plaintiff's employer, American Specialties, is engaged in the business of manufacturing stainless steel products, such as bathroom accessories. (Def. Rule 56.1 Stmt. ¶ 27.) In June 2005, it owned three forklifts: two Hyster forklifts and one Komatsu Forklift. (Id.) The Hysters were two different models: the H50XL and the H50XM. (Def. Mot. Ex. T, (hereinafter, "Picarillo Aff.") ¶ 5.) The Hyster H50XL bears the serial number C177B14816P; the Hyster H50XM bears the serial number H177B19705X. (Id.)

---

[2] The Stipulation did not name defendant "Modern" as a party to it. Counsel informed the Court that this was an oversight, and that "Modern" is not, in fact, an actual entity.

Plaintiff worked as a forklift operator for American Specialties. He began his employment "assembling parts and cleaning parts" in 1998 (Rodriguez Dep. Tr. at 20:17-18), and after approximately five years on the job, he was promoted to forklift operator. (Id. at 21:21-22:1.) Rodriguez was trained to operate a forklift by watching an approximately one half-hour instructional video. (Id. at 23:20-24:22.) The video was translated from English into Spanish for plaintiff, who is primarily a Spanish speaker. (Id.)

About a week after he watched the video, Rodriguez began operating forklifts for American Specialties. (Id. at 24:23-24:2.) He continued to operate forklifts for about one year until his accident in June 2005, driving what he referred to as "two Hi-Lo's"—the Hyster H50XL and what he called the "camacho." (Id. at 29:16-23; 30:1-12.) Rodriguez was asked at his deposition whether the forklift involved in his accident was the Hyster H50XL and he answered, "yes." (Id. at 30:6-9.) He further testified that there came a point five months prior to the accident where he operated the Hyster H50XL exclusively and that during those five months he continuously experienced problems with the brakes. (Id. at 30:13-31:17.) Rodriguez stated that when he applied the brake to stop the vehicle, the forklift would continue to move. (Id. at 32:14-23.) He says told his boss at American Specialties, "Jose," about these problems. (Id. at 31:11-21.)

According to Rodriguez, the brakes on the Hyster H50XL were fixed in March or May of 2005. (Id. at 33:19-23.) Rodriguez did not know the name of the company that made such repairs, but remembers that he "always saw" a mechanic from defendant Starlift coming to American Specialties during that time frame. (Id. at 34:10-24; 96:21-97:10.)

3

According to Rodriguez, even after the repairs were made, the brakes continued to malfunction. (Id. at 35:21-24.) Rodriguez says he continued to complain to his boss and to the "mechanic of the factory," who Rodriguez called "Dick," about the problems, but to no avail. (Id. at 31:24-32:2; 33:22-23.) Rodriguez testified that he never spoke to any one from Starlift who came to American Specialties to perform repairs. (Id. at 101:23-25.) Other than the service he believed took place in March or May, Rodriguez could not remember whether there was any other service done to the brakes of the Hyster H50XL. (Id. at 36:9-14.)

Rodriguez's boss at American Specialties, Jose Castaneda ("Castaneda"), who worked in the receiving department and was with Rodriguez the day of the accident, testified that Rodriguez never complained to him about how the forklift he operated functioned. (Def. Mot. Ex. O, Castaneda Dep. Tr. 11:25-12:3.) Castaneda says he never complained to his superiors at American Specialties about the forklift Rodriguez operated. (Id. at 12:4-6.)

Starlift's Agreement with American Specialties

Starlift is in the business of sales, service and rentals of forklifts. It had an oral agreement with American Specialties to maintain and repair American Specialties' three forklifts. (Def. Rule 56.1 Stmt. ¶ 3.) Starlift's own account of that oral agreement in the record is, regrettably, less than clear. Starlift's President, Raymond Picarillo ("Picarillo"), testified that beginning in 1999, Starlift had a service contract with respect to American Specialties' Komatsu forklift. (Def. Rule 56.1 Stmt. ¶ 42; Def. Mot. Ex. J, Picarillo Dep. Tr. at 21:3-16; 22:9-12.) Picarillo also testified that as of May of 2005, Starlift began performing regular, periodic maintenance, as well as on-demand service

calls, with respect to American Specialties' two other forklifts—the Hyster forklifts.

(Picarillo Dep. Tr. at 23:2-22.)   The agreement to provide maintenance and on-demand

service calls to the American Specialties' forklifts was not reduced to writing.  (Id. at

24:16-23; Def. Rule 56.1 Stmt. ¶ 41.)  According to Starlift, it only made a service call to

American Specialties, outside of the regular, periodic maintenance, if American

Specialties called and asked it to. (Id. at 27:21-28:5.)  Joseph Ochojski ("Ochojski"),

Vice President of Production at American Specialties, testified that in order for Starlift to

come in and service a forklift, American Specialties needed to issue it a written purchase

order.  (Def. Mot. Ex. H, Ochojski Dep. Tr. at 24:21-24.)

Picarillo testified that American Specialties ended its service contract and stopped

doing any business with Starlift some time after June 7, 2005, the date of plaintiff's

accident. (Picarillo Dep. Tr. at 21:12-22:25.)  According to Picarillo, American

Specialties informed Starlift that it had switched vendors, but plaintiff's accident was not

mentioned.  (Id. at 22:17-25.)

Starlift's Repair of the Hyster H50XL Forklift

According to American Specialties employee, Thomas Tanner ("Tanner"), who

plaintiff identifies as his supervisor (see Pl. Rule 56.1 Stmt. ¶ 32), it was the

responsibility of American Specialties' outside contractor to repair any problems with the

forklift. (Mota Aff. Ex. I, Tanner Dep. Tr. at 70:5-16.)

Ochojski testified that approximately one month before the accident, he heard

from someone—Ochojski could not remember if it was the forklift driver or a

mechanic—that there was a problem with the brakes on one of American Specialties'

forklifts. (Ochojski Dep. Tr. at 31:24-33:17.) American Specialties had the brake problem serviced by Starlift. (Id. at 33:3-23. Def. Rule 56.1 Stmt. ¶ 46.)

A Starlift employee, Thomas DeBacco ("DeBacco") testified that he made a service call to American Specialties on May 9, 2005. (Def. Mot. Ex. K, DeBacco Dep. Tr. 27:25-28:4.) DeBacco testified at his deposition that, generally speaking, Starlift would send a mechanic, such as himself, out on a service call after receiving an indication from a customer that it is having a problem. (Id. at 18:22-19:6.) DeBacco did not believe he received any information from American Specialties indicating that there was a problem with the forklift's brakes prior to making the service call on May 9th. (Id. at 9-13.)

DeBacco testified, relying in part on his notes from the work order he completed for the job, that during this service call to American Specialties, he inspected the Hyster H50XL forklift and determined that a petroleum-based product had gotten into the left brake and was preventing the friction necessary for the brakes to work properly. (Id. at 22:15-25:23; Def. Rule 56.1 Stmt. ¶ 53.) According to DeBacco, the problem was caused be "a leaking wheel cylinder and a leaking axel seal" which both were leaking brake fluid into the brake system. (Id. at 34:19-35:2.) DeBacco removed and replaced several parts in the left brake, including the seals, wheel cylinders, the master cylinder. (Def. Rule 56.1 Stmt. ¶ 54;) DeBacco also checked the right brake and determined that the "brake line" on the right side was also damaged. (Def. Rule 56.1 Stmt. ¶ 55.) DeBacco also removed and replaced parts in the right brake, including the brake booster and the transmission filter. (Id. ¶¶ 58, 59.) According to DeBacco, it was Starlift's procedure for Hyster forklifts to replace the brakes on both sides if one side was determined to have a

6

problem. (DeBacco Dep. Tr. at 33:14-20.) DeBacco also repaired and replaced the forklift's parking brake. (Id. ¶ 61; DeBacco Dep. Tr. at 47:2-25.) Finally, as part of DeBacco's repairs, he added brake fluid to the machine. (DeBacco Dep. Tr. at 34:7-25; 35:2-5.)

After DeBacco finished repairing the brake system, he tested the brakes, including the parking brake, by driving the forklift himself and applying the brake. (Def. Rule 56.1 Stmt.¶¶ 66, 67; DeBacco Dep. Tr. at 62:7-15; 62:18-64:22.) DeBacco drove the machine on a flat surface without any material loaded onto it. (Id. at 64:5-10.)

DeBacco did not adjust the parking brake after he finished making the repairs. (Mota Aff. Ex. F, DeBacco Dep. Tr. at 66:18-20.) Tanner, of American Specialties, testified that the adjusting the parking brake was something that American Specialties relied on the mechanics to do and it was not something that American Specialties taught its forklift operators to do in training. (Pl. Mot. Ex. I, Tanner Dep. Tr. at 23:9-22.)

DeBacco worked on the Hyster H50XL forklift's brakes for three days—May 9, 11 and 13, 2005. (Id. ¶¶ 50, 59, 60.) In connection with this work, DeBacco completed a work order, which he submitted to American Specialties, billing it $2442.11 for labor and parts. (Id. ¶ 63.) The work order, introduced through DeBacco's deposition, states that repairs were made to the brakes of the Hyster H50XL forklift, serial number C177B14816P, and is dated May 26, 2005. (Def. Mot. Ex. L.) The work order also contains notes DeBacco took each day he worked on the Hyster H50XL. (Id.)

DeBacco acknowledged during his deposition that prior to undertaking the aforementioned repairs he did not review a service manual or owners' manual with

reference to the braking system of the Hyster model forklifts. (Mota Aff. Ex. F., DeBacco Dep. Tr. at 21:6-11.)

Starlift asserts that, after May 13, American Specialties did not contact Starlift to perform any further repairs or to follow up on the repairs that had been made to the braking system of the Hyster H50XL. (Def. Rule 56.1 Stmt. ¶ 67.) On June 21, 2005, Starlift did return to perform periodic maintenance on the American Specialties' forklifts, including the Hyster H50XL. (Id. ¶ 68; Def. Mot. Ex. J, Picarillo Dep. Tr. at 69:7-18.)

Picarillo, Starlift's President, stated in his affidavit submitted with defendant's motion papers that American Specialties' other Hyster forklift—the Hyster H50XM— was repaired only two times by Starlift prior to the date of the accident—once on February 17, 2005, to address a leaky fitting in the hydraulic lift system and once on May 10, 2005, to replace the forklift's battery. (Def. Mot. Ex. T, Picarillo Aff. ¶ 6-8.) Attached to Picarillo's affidavits are Starlift's service records evidencing the service calls made on those dates. (Id.) Starlift never performed any work on the braking system of the Hyster H50XM. (Id. ¶ 9.)

The June 7, 2005 Accident

Rodriguez testified that on June 7, 2005, he was operating the Hyster H50XL forklift at American Specialties place of business at 441 Saw Mill River Road, Yonkers, New York. (Rodriguez Dep. Tr. at 30:6-9.) He was using the forklift that day to unload boxes from a shipping trailer parked at a warehouse loading dock. (Id. at 39:23-41:8.) The shipping trailer was pulled up flush with the loading dock. Because the height of the loading dock was lower than the height of the shipping container, the floor of the

8

shipping container was on a downward incline. (Id. at 48:18-49:11.) Rodriquez estimated that the incline was at a fifteen degree angle. (Id.)

At some point between 7 a.m. and 8 a.m. that day, Rodriguez got off of the forklift to get a crow bar. (Id. at 38:10-17; 50:4-22.) Rodriguez testified that he stopped the forklift inside the shipping trailer, (id. at 51:11-12), engaged the emergency brake and dismounted the vehicle. (Id. at 110:21-25). Rodriguez could not recall whether or not the "forks" (the prongs on the forklift that carry material) of the Hyster H50XL were "up" or "down" when he dismounted, or if the engine of the forklift was running or not. (Id. at 51:13-18; 52:1-7.) He also could not recall whether, when he got off, the rear wheels of the forklift were straight or turned at angle. (Id. at 62:25-63:4.) Castaneda testified that he saw Rodriguez "pull the brake" and that the forklift was stopped and "only the light was on" as Rodriguez was dismounting. (Mota Aff. Ex. J, Castaneda Dep. Tr. at 17:17-21; 24:10-19.)

When Rodriguez was walking back towards the forklift with the crow bar, the forklift moved approximately three feet (Rodriguez Dep. Tr. at 51:19-52:1; 61:20-25), and struck him where he stood inside the shipping trailer. (Id.) Rodriguez recalled that he was hit by the side of the machine opposite where the forks are located. (Id. at 56:13-19.) The resulting collision knocked plaintiff to the floor and caused him to land in such a way that the forklift was on top of him. (Id. at 57:19-20.) The first person to come to plaintiff's aid was Castaneda. (Id. at 57:12-14.) Castaneda did not know how to operate the forklift, however, so could not move it off of plaintiff's body. (Id. at 58:7-14.) Ultimately, the forklift was moved and driven away by someone plaintiff identified as "Chino." (Id. at 58:7-18.)

9

Rodriguez was taken by ambulance (id. at 60:1-4.) to Westchester Medical

Center. (Id. at 61:2-3.)

The Accident Investigation

A few minutes after the accident, Ochojski arrived at the scene and found the

plaintiff lying on the floor of the shipping trailer. (Def. Mot. Ex. H., Ochojski Dep. Tr.

36:11-37:7.) He observed that the forks of the forklift were "partially up" and that the

brake was set. (Id. at 44:14-20.)

The Yonkers Police Department responded to the accident approximately fifteen

to twenty minutes after it occurred. (Rodriguez Dep. Tr. at 59:16-20.) According to the

police report, the police found Rodriguez lying on his right side inside the shipping

trailer. (Def. Mot. Ex. P.) The police report identifies the forklift as the "Hyster Model

50, Number 102"—it is not clear from the police report, or other record evidence,

whether this transcription refers to the Hyster H50XL or H50XM.

An investigator from the Occupational Safety and Health Administration (OSHA)

also went to American Specialties on the day of the accident. (Def. Rule 56.1 Stmt.

¶ 106.) In connection with his findings, the OSHA investigator prepared a report, which

defendant submits with its papers. (Def. Rule 56.1 Stmt. ¶¶ 107, 108.) The OSHA report

identified the forklift involved in the accident as the "Hyster 50-Hi Lo, serial

#H177B19705X." (Def. Mot. Ex. Q.) The OSHA report contains other entries but many

of them are so heavily redacted that much of the report is incomprehensible.

On June 29, 2005, twenty-two days after the accident, a field investigator for

American Specialties' workers' compensation carrier, Wausau Insurance Company

("Wausau"), also visited American Specialties to conduct an accident investigation. In

10

the Wausau report the forklift involved in the accident was identified as "HYST, Model #H50XM, Serial # H177B19705X." (Def. Mot. Ex. U.)

Expert Reports

Both parties have retained experts in this matter.

Defendant submitted with its papers an expert report from William J. Meyer. (Def. Mot. Ex. R.) Plaintiff objects to Meyer's report, dated August 19, 2008, on the ground that it is untimely, in violation of the revised Case Management Plan that this Court endorsed on March 20, 2008, which provided a deadline of July 24, 2008 for defendant's expert reports. (Dkt. # 7; Def. Mot. Ex. G.) Plaintiff states that it "formally rejected" Meyer's expert report by letter dated September 4, 2008. (Pl. Rule 56.1 Counter-Stmt. ¶ 115-118.) However, the Court never received such a letter, and no such letter appears on the case docket. It is too late now for plaintiff to object to the report based on its untimeliness. Moreover, plaintiff received Meyer's report well in advance of trial and has not suffered any prejudice from the delay.

Plaintiff also objects to Meyer's report on the ground that it is not in proper evidentiary format because Meyer did not submit a signed affidavit with the report. With its reply papers, however, defendant submitted a sworn, notarized, affidavit from Meyer, attesting to the contents of his report annexed to defendant's moving papers. (Def. Reply Ex. F.) Defendant therefore properly cured the report's defect, and the Court will not exclude the report on that basis. See, e.g., Capobianco v. New York, 422 F.3d 47, 55 (2d Cir. 2005).

Meyer, who is an engineer by education and by background, is currently employed as an "Engineering Consultant," whereby he studies the "Performance of

11

mechanical engineering projects related to equipment and facility design." (Def. Mot. Ex. R.) After reviewing various documents in the record, Meyer opined that the accident and injury to Rodriguez "did not result from any impropriety or shortcoming on the part of Starlift Equipment Company." (Def. Mot. Ex. R.) According to Meyer, the accident occurred "solely from Mr. Rodriguez's failure to exercise reasonable care while operating the subject forklift," in particular his failure to properly engage the brake prior to the accident.

To support his opinion, Meyer cites to Rodriguez's testimony that on the day of the accident the forklift was momentarily held in a stationary position with the forks raised while on an approximately fifteen degree inclined surface. This, according to Meyer, indicates that the brakes were functional. (Id.) The fact that the movement began from this initially stationary position, according to Meyer, suggests that the parking brake was somehow inadvertently released or that a mechanical failure occurred within the brakes. However, Meyer opined that since, based on his review of the case documents, there was "no evidence that a mechanical failure of the parking brake system occurred" is likely that Rodriguez did not properly engage the parking brake prior to the accident. (Id.)

Meyer reasoned that Rodriguez failed to exercise due care by leaving the forklift, with the forks raised, on an inclined surface—especially considering that Rodriguez said he knew of previous problems with the brakes on the forklift he was using. (Id.)

Plaintiff also hired an expert, who similarly reviewed case documents and prepared a report rendering an opinion on the cause of the June 7th accident. (Def. Mot. Ex. S; Mota Aff. Ex. K.) Plaintiff's expert, S.C. Malguarnera, has a Ph.D. in mechanical

engineering from M.I.T. and describes himself as a "Technical Consultant," and his resume reports that he "Investigates, analyzes, and reconstructs accidents involving machines, mechanical products, motor vehicles, and industrial equipment." (Id.)

According to Malguarnera, DeBacco did not perform the May 9-13, 2005 repairs properly because he did not adjust the parking brake or test the forklift's brakes with "a capacity load at 15% incline/slope" in accordance with the Hyster Service Manual. Malguarnera states that the purpose of adjusting the forklift brakes is to "tighten the cables affixed to the brake in order to eliminate any slack," and the purpose of testing the forklift on an incline while carrying a load is "to ensure that they forklift will not move when the parking brake is engaged in an actual situation involving a forklift operator." (Id.) Malguarnera testified that DeBacco's testing of the braking system was deficient because DeBacco testified that he only pulled the parking lever and tested the forklift by driving on a flat, rather than inclined, surface. (Id.) Malguarnera believed that had DeBacco adjusted and tested the forklift parking brake in the manner described in the Hyster Service Manual—i.e., by driving it with a load on an inclined surface—the forklift would have remained in position after Rodriguez applied the parking brake and would not have injured him. (Id.) Finally, Malguarnera submitted that Rodriguez was not negligent in causing in the accident. (Id.)

In their reports, both Meyer and Malguarnera identify the forklift involved in the accident as the Hyster H50XL serial number C177B14816P. (Def. Mot. Ex. R & Ex. S.)

Plaintiff's Injuries

Plaintiff testified that the accident injured his pelvis, left knee, left shoulder and back, and that he remained in the hospital for three weeks. (Id. at 71:7-24; 69:5-7.) After

13

plaintiff left the hospital, he testified that he remained bedridden, unable to walk or sit up without aid, for another month (id. at 70:2-71:6), and had to use a wheelchair to get around for three months (id. at 75:2-4), and crutches for seventeen months after that. (Id. at 75:13-15.) Rodriguez continues to walk with a cane. (Id. at 75:25-76:8.) Rodriguez also testified that he receives medical treatment for his injuries every five to six weeks (id. at 77:11-80:25) and that, subsequent to his release from Westchester Medical Center, he underwent a surgical procedure on his knee at Cabrini Hospital in the Bronx. (Id. at 82:9-13.) Rodriguez continues to take medication for his injuries (id. at 81:1-16) and attends physical therapy three times a week. (Id. at 82:22-83:6.) Rodriguez testified that he still lives with a great deal of discomfort, pain and limitation due to his injuries. (Id. at 89:17-90:20.)

## *DISCUSSION*

### I.   Standard

A party is entitled to summary judgment when there is no "genuine issue of material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). In addressing a motion for summary judgment, "the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in [its] favor." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Whether any disputed issue of fact exists is for the court to determine. Balderman v. United States Veterans Admin., 870 F. 2d 57, 60 (2d Cir. 1989). The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. Celotex v. Catrett, 477 U.S. 317, 323 (1986). Once such

14

a showing has been made, the non-moving party must present "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." Scotto v. Almenas, 143 F. 3d 105, 114 (2d Cir. 1998).

Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." Anderson, 477 U.S. at 248. Finally, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita., 475 U.S. at 586. To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant.

## II. Starlift's Liability for Rodriguez's Accident and Resulting Injuries

### A. Negligence Standard in New York

This action was removed to this Court from the Supreme Court, State of New York, County of Bronx, pursuant to this Court's diversity jurisdiction under 28 U.S.C. § 1332. According to the removal notice, plaintiff is a citizen of New York, and defendant is a New Jersey corporation with its principal place of business in Connecticut. (See Dkt. # 1.) The accident occurred in New York and both parties have asked the Court to apply New York law. Accordingly, this Court will apply the law of the forum state, New York. See Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 496-97 (1941); Neumeier v. Kuehner, 31 N.Y.2d 121 (1972); Babcock v. Jackson, 12 N.Y.2d 473 (1963).

15

Under New York law, to make out a prima facie case of negligence, a plaintiff must establish (i) the existence of a duty owed by a defendant to the plaintiff, (ii) a breach of that duty, and (iii) that such breach was a proximate cause of injury to the plaintiff. See, e.g., Nappi v. Inc. Village of Lynbrook, 19 A.D.3d 565, 566 (2d Dep't 2005).

In order to defeat defendant's motion for summary judgment, plaintiff must raise a material issue of fact about whether Starlift was negligent as a matter of law.

**B.     Starlift's Duty of Care to Rodriguez**

The threshold question on this motion is whether Starlift owed any duty of care toward Rodriguez. That is a question of law for the court. Palka v. Servicemaster Mgmt. Serv. Corp., 83 N.Y.2d 579, 585 (1994).

In this case, the undisputed evidence demonstrates that there was some sort of agreement between American Specialties and Starlift concerning the repair and maintenance of forklifts. Unfortunately, that agreement was never reduced to writing. Based on Starlift's account, the arrangement required Starlift to perform periodic maintenance on American Specialties' forklifts and also service the forklifts for repairs on an as-needed basis. (See, .e.g., Def. Mot. Ex. T, Picarillo Aff. ¶¶ 3-4; discussion, *supra*, at 4-5.) The issue is whether Starlift, by virtue of this agreement with American Specialties, owed a duty to Rodriguez, a third party.

The contractual obligation between Starlift and American Specialties does not in and of itself give rise to a duty of care toward third persons who are not parties to that contract. See, e.g., Eaves Brooks Costume Co. v. Y.B.H. Realty Corp., 76 N.Y.2d 220, 226 (1990); Palka, 83 N.Y.2d at 584. The New York Court of Appeals has identified

16

three circumstances when Party A assumes a duty of care toward a third party by virtue

of his contract with Party B:

> (1)     Where the contracting party, in failing to exercise reasonable care in the performance of his duties, launches a force or instrument of harm, H.R. Moch Co. v. Rennselaer Water Co., 247 N.Y. 160, 167-68 (1928);

> (2)     Where the plaintiff detrimentally relies on the continued performance of the contracting party's duties, Eaves Brooks, *supra*, 76 N.Y.2d at 226; or

> (3)     Where one contracting party has entirely displaced its contraparty's duty to maintain premises safely.  Palka, supra, 83 N.Y. 2d at 585-86.

See Espinal v. Melville Snow Contractors, Inc., 98 N.Y.2d 136, 140 (2002).

The first exception (the so-called Moch exception) occurs when the contracting

party (in this case, Starlift), in the performance of its duties under the contract, failed to

exercise reasonable care, thereby launching "a force or instrument of harm." Moch, 247

N.Y. at 168.  Plaintiff argues that this case falls under the Moch exception under the

theory that Starlift negligently repaired the brakes of the forklift plaintiff used on June 7.

(Pl. Opp'n Mem. at 5.)  In support of this theory, plaintiff offers its expert's opinion that

Starlift's mechanic did not properly complete the repairs to the forklift's brakes during

the service calls to American Specialties on May, 9, 11 and 13, because he failed to

adjust the parking brake and to test the brakes by driving the lift with a full load at a 15%

incline. (Mota Aff. Ex. K.)  According to plaintiff, Starlift's mechanic's failure to

perform these tasks was in contravention of the Hyster Service Manual.  (Id.)  By failing

to correctly adjust and test the parking brake, plaintiff argues that defendant launched an

instrument of harm, which caused injury to plaintiff.

Defendant counters that Starlift's maintenance records, the report of the OSHA

inspector, as well as the report of the Wausau insurance inspector, all show that the

17

forklift that was repaired by DeBacco was not the forklift involved in plaintiff's accident. Therefore, defendant argues that it cannot be liable, as a matter of law, for launching an instrument of harm when plaintiff was injured on a different forklift from the one which Starlift repaired.

It is undisputed that American Specialties had two Hyster forklifts: one Model H50XL, bearing serial number C177B14816P; and one Model H50XM, bearing serial number H177B19705X. According to the May 26, 2005 work order, DeBacco performed brake repair work on the former machine. There is absolutely no evidence that Starlift performed any brake maintenance on the forklift Model H50XM bearing serial number H177B19705X prior to plaintiff's accident. But according to OSHA and Wausau records, the Hyster Model H50XM, bearing the serial number H177B19705, was the forklift that was involved in the accident.

Plaintiff has two responses to defendant's arguments. The first is that the OSHA and Wausau reports should be disregarded as inadmissible hearsay because they were not properly authenticated. Defendant points out that plaintiff provided it with the OSHA report in discovery so it should not be concerned with its authenticity. In any event, the issue of authentication of the reports has been mooted as, in its reply papers, defendant has provided affidavits from those with personal knowledge attesting that the reports are business records prepared in the ordinary course of business.

The OSHA report has been authenticated as a business record under Federal Rule of Evidence 803(6) by the custodian of records for the Tarrytown Area OSHA office. (Def. Reply Ex. G, Cherasard Aff.) The contents of the report, which reflect the personal knowledge of the OSHA investigator as he created the report on the day of the accident in

the ordinary course of business are admissible. However, the report appears to contain an interview with plaintiff (again, the redactions make the report largely unintelligible), which would constitute double hearsay under Federal Rule of Evidence 805. "Double hearsay is not admissible unless each level of hearsay is covered by an exception to the hearsay rule." Agriculture Ins. Co., Inc. v. Ace Hardware Corp., 214 F. Supp. 2d 413, 416 (S.D.N.Y. 2002). Since plaintiff is a party to the lawsuit, however, his statements in the OSHA report, if they are legible, may come in as a non-hearsay party admission under 801(d)(2)(B).

The Wausau report has been authenticated by the Wausau Field Investigator, Robert Nugent, who prepared the report. (Def. Reply Ex. H, Nugent Aff.)  The report therefore falls under the business records exception to the hearsay rule. Fed. R. Evid. 803(6). However, Nugent's report relies on statements from non-parties, Ochojski, Tanner and Castaneda, gathered by Nugent in his investigation, which also constitute hearsay within hearsay. Fed. R. Evid. 805. (Def. Mot. Ex. U.) Inadmissible hearsay does not become admissible solely by virtue of its inclusion in an admissible report. See, .e.g., Parsons v. Honeywell, Inc., 929 F.2d 901, 907 (2d Cir.1991). The statements must fall into one of the enumerated exceptions to the hearsay rule under Rule 803 if they are to come in. See Ace Hardware, supra, 214 F. Supp. at 413. Otherwise, only that which Nugent himself could testify to in open court is admissible. See Eng v. Scully, 146 F.R.D. 74, 79-80 (S.D.N.Y. 1993.)

It appears that Nugent's written report, created twenty-two days after the accident, is based entirely on the statements of non-parties he interviewed in his investigation. Although Nugent may well have prepared the report in the regular course of business, he

19

does not have personal knowledge of the information contained in the report, which is now being offered for its truth. The written portion of the report is therefore inadmissible. The pictures of the forklift appended to the report, however, are admissible as non-hearsay because they were taken by Nugent himself and can be authenticated as part of the business record. (Nugent Aff. ¶ 3.)

Plaintiff has not objected to the admission of the police report as hearsay and the Court finds the report admissible as a public record under Federal Rule of Evidence 803(8). However, the portion of the report that relies on non-party statements from Ochojski would similarly be inadmissible because it does not fall under any exception to the hearsay rule. See Honeywell, *supra*, at 929 F.2d at 907.

Second, plaintiff argues that there is a genuine issue of fact concerning which forklift was involved in the accident, and that the weight of the evidence shows that the forklift involved in the accident was, in fact, the Hyster H50XL that received brake service from American Specialties in May 2005. The Court finds that the plaintiff has raised a triable issue of fact on which forklift was involved in plaintiff's accident.

As an initial matter, plaintiff himself testified that the forklift involved in his accident was the Hyster H50XL. (Rodriguez Dep. Tr. at 30:6-9.)

Additionally, it appears that, until defendant came into possession of OSHA and Wausau reports (which apparently did not happen until well into the discovery phase of this case), it, too, believed that the forklift involved in the accident was the Hyster H50XL. The record contains numerous inconsistencies over which forklift was involved in the accident.

At his deposition, American Specialties' Ochojski was shown a copy of the Starlift work order, dated May 26, 2005, which states that repairs were made to the brakes of the Hyster H50XL forklift, serial number C177B14816P. (Def. Mot. Ex. L.) When asked if the brake problems referenced in that report correspond to the forklift involved in Rodriguez's accident, Ochojski testified, "Yes." (Pl. Mot. Ex. A Ochojski Dep. Tr. at 45:10-15; Ex. B.) Starlift claims that this testimony was "erroneous." (Def. Rule 56.1 Reply Stmt. ¶ 2.) However, Ochojski's testimony that he heard about problems with a forklift's brakes, from a mechanic or a driver, about a month before the accident and that the forklift was then serviced is consistent with plaintiff's own testimony. (See Rodriguez Dep. Tr. at 30-33; Ochojski Dep. Tr. 31:24-33:17.)

Defendant points out that Ochojski *also* testified that the two Hyster model forklifts—the H50XL and the H50XM— were essentially identical and that only way to differentiate between was by the parking brake; one forklift had the brake on the left side and the other on the right side. (Def. Reply Ex. A, Ochojski Dep. Tr. at 16:18-23.) Ochojski further testified that on the day of the accident, Rodriguez used the Hyster with the brake on the left side. (Id. at 16:24-17:7.) Starlift submits that the photographs attached to the Wausau report of the Hyster H50XM show its brake on the left side. (Def. Rule 56.1 Reply Stmt. ¶ 2; Def. Mot. Ex. U.) Defendant argues that these two pieces of evidence demonstrate that Rodriguez did, in fact, use the Hyster H50XM, whose brakes were never repaired, on the day of his accident.

Plaintiff submits that the inconsistencies in the other record documents are still sufficient to raise a material issue of fact about which forklift was used in the accident. To wit, in defendant's Response to Interrogatories (Mota Aff. Ex. C), dated February 12,

2008, defendant admitted, upon information and belief, that the Hyster Model H50XL,
bearing serial number C17714816P was the forklift involved in plaintiff's accident. (Id. ¶
4.) Defendant contends that this response was made in error because defendant did not
know which forklift was involved in the accident until it received and reviewed the
Wausau and OSHA reports, and relied on the allegations in plaintiff's complaint, which
identified the forklift in the accident as the H50XL. (Def. Rule 56.1 Reply Stmt. ¶ 2;
Def. Reply Ex. C, Sinclair Aff.)

Additionally, in its Local Rule 56.1 Statement, defendant states that Modern
Handling Equipment of New Jersey sold the forklift plaintiff operated on June 7, 2005 to
American Specialties in or about 1993. (Def. Rule 56.1 Stmt. ¶ 30; Def. Mot. Ex. P.)
During the deposition of a non-party witness, defense counsel agreed to stipulate on the
record that the forklift Modern Handling Equipment sold to American Specialties in 1993
bore the serial number C177B14816P. (Def. Mot. Ex. I, Frassa Dep. Tr. at 18:6-19.)
Again, defendant argues that its papers are in error and "should" have read that "Modern
Handling sold the forklift that plaintiff *alleged* to be operating on June 7, 2005, in or
about 1993" (Def. Rule 56.1 Reply Stmt. ¶ 2) and that when defense counsel made the
stipulation, he did not know which forklift was involved in the accident. (Id.) Among
the exhibits to defendant's motion, is an invoice from Modern Handling Equipment of
New Jersey, dated May 13, 1993, for the sale of a Hyster H50XL bearing serial number
C177B14816P. (Def. Mot. Ex. P.)

Finally, both expert reports were written on the assumption that the forklift
involved in the accident was that Hyster H50XL, with serial number C177B14816P.

Reading the record in the light most favorable to the non-moving party—the plaintiff—there is triable issue of fact as to which Hyster forklift was involved in plaintiff's accident. Given plaintiff's own testimony, conflicting documents in the record, and the fact that one of the records relied on by defendant is almost entirely inadmissible hearsay, the Court is unconvinced that judgment as a matter of law is warranted in this case.

Because identification of the forklift involved in the accident is a predicate issue that must be settled prior to deciding whether defendant launched an instrument of harm so as to fall under the Moch exception to non-liability, the Court will go no further in that analysis. Having found a triable issue of fact, the Court also will not proceed to analyze whether defendant falls under either of the other two exceptions to non-liability and will reserve those questions for a jury.

Defendant's motion for summary judgment is denied.

The case is set for trial on September 7, 2009. The final pre-trial conference will be held on July 25, 2009. The parties should modify the pre-trial order to reflect the rulings made in this decision and resubmit it by July 2, 2009. In limine motions are due on July 2, 2009; responses to in limine motions on July 9, 2009. The Court does not accept replies on in limine motions. All in limine motions will be decided at the final pre-trial conference on July 25, 2009. All objections to exhibits will be ruled on at the final pre-trial conference. Counsel shall come prepared to argue objections.

This constitutes the decision and order of this Court.

Dated: March 20, 2009

U.S.D.J.

BY ECF TO ALL COUNSEL

24